IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 7, 2025 Session

**CITY OF HENDERSONVILLE v. J AND J VENTURES, LLC, ET AL.**

**Appeal from the Circuit Court for Sumner County**
**No. 2023-CV-732, 2023-CV-850, 2024-CV-697     Joe Thompson, Judge**

_____

**No. M2025-00293-COA-R3-CV**
_____

A municipal court determined that property owners repeatedly violated a city zoning ordinance restricting vacation rentals in residential areas. The property owners appealed to circuit court, where the matter was consolidated with another action filed by the City against the property owners in which the City was seeking a declaratory judgment and injunctive relief. The circuit court found the property owners in violation of the zoning ordinance and granted a declaratory judgment and a permanent injunction, and affirmed the municipal court's rulings as to the violations. The property owners appeal. In doing so, they advance numerous issues challenging the circuit court's rulings. While significant briefing deficiencies result in the waiver of the majority of these issues, in considering the issues that are properly before this court, we conclude that the trial court erred in its interpretation of the ordinance. However, because our decision does not fully resolve whether the property owner violated the ordinance, we remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated;**
**Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Jeremy R. Durham, Brentwood, Tennessee, for the appellants, Jeremy Ryan Durham, Jessica Durham, and J and J Ventures, LLC.

Lance A. Wray, Hendersonville, Tennessee, for the appellee, City of Hendersonville, Tennessee.

**OPINION**

I.

Jeremy Durham and Jessica Durham are the members of J and J Ventures, LLC ("J&J"),[1] which owns various properties that are advertised for use as short-term rentals on websites like Airbnb. Two of these properties are located in the City of Hendersonville, Tennessee, in areas zoned residential. In such residential zones, the City prohibits dwellings and structures from being used as "vacation rentals." By Ordinance 2016-16 (the Ordinance), the City has defined a "vacation rental" as follows:

> A dwelling unit or other structure rented and/or used exclusively by a person or group of persons for lodging for terms of less than 30 days. Rented means any form of monetary or non-monetary consideration. A Vacation Rental is also a Short Term Rental.

Shortly after J&J began renting one of its Hendersonville properties, the City issued a letter indicating that it had been made aware that the property was "possibly being rented out for vacation rentals." In the letter, the City cited the Ordinance as the basis for the prohibition upon such usage. The City instructed J&J to "discontinue the use immediately to avoid the issuance of a citation."

J&J responded that the rental property was its "Corporate Residence" and that, going forward, it "plan[ned] to attempt to convert any potential future occupants of the Corporate Residence away from any type of landlord/tenant relationship and into corporate clients." J&J provided the City with its "Confidential Travel Consulting Services Agreement and Release" that it allegedly planned to have future occupants sign prior to stays at the property.[2] J&J took the position "that clients who pay the Company for services

---

[1] Throughout, we use J&J to refer to the LLC as well as Mr. and Ms. Durham.

[2] The agreement and release included, among other things, the following statements:

A. The Client may have contacted the Company through a third-party website seeking lodging accommodations.
B. The Company communicated to the Client that the Company legally cannot and will not directly provide lodging accommodations in exchange for monetary compensation.
C. Contrarily, the Client accepted the Company's suggestion to provide travel consulting services.
D. The Parties desire to enter into this Confidential Travel Consulting Services Agreement and Release . . . in order to define the relevant payment terms and scope of services to be rendered . . . .
E. Due to the Client's status as a valued client of the Company and in no way directly related to any payment for lodging accommodations, the Client shall be permitted but is not required to stay at the Company's residence at [the address] in [the City] through the dates of _____.
. . .
1. Scope of Services . . . . The travel consulting fee is earned as payment for services

. . . and not lodging, fall outside the scope of the ordinance."  It also suggested that "the Company may shift its focus to directly renting to medical professionals (for 30 days or longer) in the not-so-distant future."

The City informed J&J that it intended to strictly enforce the Ordinance regardless of how J&J characterized the rentals.  J&J did not change its practice of renting its Hendersonville properties for terms of fewer than 30 days.  Over the months that followed, the City received numerous complaints about short-term rentals at J&J's properties.  Based on this usage, the City issued 11 citations for alleged violations of the Ordinance at one of the properties between December 2022 and April 2023.  Between July 10, 2023, and July 19, 2023, the City issued another 16 citations for alleged violations, which were divided among J&J's two Hendersonville properties.

After separate proceedings addressing the first and second groups of citations, the municipal court found that J&J had violated the City's ordinance with each of the alleged occurrences.  Specifically, the municipal court found that "J & J tried to represent to the City that the property is used as some form of corporate retreat or in exchange for 'clients,' i.e., people staying there, providing 'travel consulting services,' and that the 'client' will be permitted to stay at the property for up to 180 days."  J&J had submitted an unsigned contract with an alleged client's name on it to support this proposition, but it "did not produce an actual signed contract from any 'client.'"  The municipal court did not credit the testimony of J&J's employee, who stated that "J & J holds events and meetings there" at the property and that the property "is not used for short-term rental purposes."  Additionally, the municipal court noted that, "[d]espite being afforded more than enough opportunity to do so, J & J offered no evidence, such as testimony, a contract, or the booking sheet, showing that the property had ever actually been rented or used by someone for 30 days or more."

On August 22, 2023, J&J appealed the adverse decisions of the municipal court to the circuit court, which consolidated the appeals.  Before the circuit court, J&J dramatically shifted its argument in defense of its usage of the properties.  In the circuit court, J&J admitted that it permitted rentals of the properties at issue for terms of fewer than 30 days, but it insisted that it had not violated Ordinance 2016-16 because "[t]he properties at issue are not rented or used **exclusively** for terms of less than 30 days."  (emphasis in original).  J&J produced two lease agreements – one for each property – showing that a lessee named Amanda Biggs had contracted to rent each of the properties for a term of more than 30 days before the end of the year.  These lease agreements were both dated February 13, 2023.  According to one contract, Ms. Biggs was to rent one of the properties for a term of 31 days, lasting from September 4, 2023, to October 5, 2023.  The other contract showed that Ms. Biggs was to rent the other property for a term of 33 days, lasting from October 29,

rendered, regardless of whether the Client chooses to stay at the Company's Corporate Residence.

2023, to November 30, 2023. Before the start of the rental term, J&J voided the 33-day contract and submitted a new contract agreeing to a future rental for a term of 92 days.[3]

Based on its interpretation of Ordinance 2016-16, J&J sought a temporary injunction restraining the City police from making contact with its guests at the properties. The circuit court declined to issue one. In doing so, the circuit court, notably, indicated that the ambiguity of the ordinance "weigh[ed] in favor of [the City], due to the language of the ordinance and specifically the vagueness of the phrase 'exclusively . . . for terms of less than thirty days.'"

Despite the court's statement regarding the ordinance's "vagueness," each party continued to assert before the circuit court that the Ordinance was unambiguous and required ruling in its respective favor. According to J&J, the placement of the word "exclusively" in the ordinance had the effect of prohibiting properties from being rented or used "exclusively by a person or group of persons," "exclusively . . . for lodging," and "exclusively . . . for terms of less than 30 days." The City, however, claimed that the word "exclusively" had the effect instead of prohibiting short-term rentals of fewer than 30 days only when a property was used exclusively by renters – as opposed to owner-occupied rentals – during the rental period.

J&J moved for summary judgment, and the City responded by filing a new complaint and its own motion for a temporary injunction. The City's new complaint named as defendants Mr. Durham, Ms. Durham, and J&J. The City sought a declaratory judgment that all three defendants "are in violation of the City's legally-adopted and valid zoning ordinance [2016-16]." It also sought temporary and permanent injunctions preventing the defendants from advertising or using the properties for rental terms of fewer than 30 days. According to the City, the defendants had been continuing to advertise and to rent the properties as short-term vacation rentals throughout the litigation, and the City had continued to receive complaints from neighbors of the properties. The City claimed that, since J&J had appealed from the municipal court's decisions on the first two sets of citations, J&J had been cited "an additional 23 times with upcoming pending municipal court dates," with "another approximately 92 [citations] to be issued and counting with each and every week."

The defendants moved to dismiss the City's new complaint for failure to state a claim on which relief could be granted pursuant to Tennessee Rule of Civil Procedure 12.02(6). They argued that, because the appeals from municipal court involved the same subject matter and one of the same defendants, the City's complaint should be barred by

---

[3] On October 10, 2023, J&J and Ms. Biggs entered a new contract with Gene and Barabara Jackson regarding the property subject to the 33-day lease. Pursuant to this new contract, they agreed "that the Prior Lease Agreement dated February 13, 2023 shall be null and void, allowing this Lease Agreement between Landlord and Tenants to supersede such Prior Lease Agreement." The new agreement leased the property to the Jacksons for a 92-day term from November 1, 2023, to January 21, 2024.

- 4 -

the doctrine of prior suit pending. The court, however, consolidated the three cases – the two cases originally stemming from the municipal court and the case stemming from the City's filing. The court also granted the City's request for a temporary injunction restraining the defendants from "any further rental activity" at the properties, "effective immediately as of September 19, 2024 . . . until the next scheduled hearing on October 7, 2024."

At the October 7 hearing, the parties relied primarily on the arguments presented in their various prior filings.[4] J&J maintained its primary position that the plain language of Ordinance 2016-16 supported its interpretation of the law, but it also advanced the alternative argument that, if the court determined that the Ordinance was ambiguous, Tennessee law mandated construction of the ordinance against the government and in favor of the property owners. J&J asserted that this should result in ruling in its favor.

In contrast, the City emphasized the purpose of the Ordinance. The City noted that the preamble to the Ordinance states the following:

> WHEREAS, the City of Hendersonville is committed to providing all residents with safe and quiet residential neighborhoods and to maintaining the highest quality of life standard; and
>
> WHEREAS, Hendersonville's growth and success have been built on housing standards and codes to favor the growth and development of residential neighborhoods; and
>
> WHEREAS, it has been determined by the Board of Mayor and Aldermen of the City of Hendersonville that it is necessary to impose restrictions on the use of homes as Vacation Rentals in order to protect the residential character of the residential zones in the City of Hendersonville: . . .

The City insisted that, through this preamble, its "legislative body declared clearly its intent and reasoning" with regard to the Ordinance.

Additionally, the City compared the Ordinance with the state statute defining a "short-term rental unit," which uses the phrase "rented wholly or partially for a fee for a period of less than thirty (30) continuous days . . . ." *See* Tenn. Code Ann. § 67-4-1501(8). According to the City, the effect of the change from "wholly or partially" in the state statue

---

[4] At the hearing, counsel for the City stated, "I believe we've made the arguments. The court's well aware of the arguments that we've made by previous court appearances, by memorandums that we filed, so I won't waste the court's time on that." Similarly, the court asked Mr. Durham, who represented all three defendants, ". . . do you have any additional arguments to make?" Mr. Durham responded, "Nothing that hasn't already been said. I've submitted three filings, briefs, and I think I've said everything there is to say, Your Honor. I don't want to waste your time."

to "exclusively" in Ordinance 2016-16 had the effect of "be[ing] more permissive" by excluding from the definition properties that were rented only "partially" while remaining occupied by an owner.

In addition to advancing its argument as to the interpretation of the Ordinance, the City also contested the factual basis for J&J's assertions that the company "does not operate either property at issue 'exclusively' for lodging for terms of less than 30 days" and that each of the properties "has, and has long been, subject to at least one valid lease of 30 days or more." In other words, the City insisted that, even if the court were to accept J&J's argument as to the interpretation of Ordinance 2016-16, J&J had still violated the Ordinance.

The City argued the lease agreements that J&J had offered in support of these contentions "lack[ed] reliability and trustworthiness." The City noted that the two initial lease agreements had allegedly been executed by the same party and on the same date in February 2023. The alleged execution date occurred after some of the citations had been issued. The two agreements indicated the lessee intended to use the two properties more than six months after the execution date. The third lease agreement on which J&J Ventures relied explicitly voided one of the initial agreements before the start of the rental term. For that reason, the City argued that the voided document was "irrelevant" to the matter. The third agreement, which replaced the voided one, was allegedly executed in October 2023, months after issuance of each of the citations at issue. Additionally, the City suggested that all three agreements "were all prepared during, or in anticipation of, and with the likely expectation of being used in this litigation." Furthermore, because of the presentation of only three such lease agreements, the City suggested that J&J may have engaged in "irregular record keeping deviating from normal procedures" or that the documents "were not created in the normal course of business and/or [were created] follow[ing] irregular business practices."

In an oral ruling following the October 7 hearing, the trial court denied J&J's motion for summary judgment and motion to dismiss, granted the City a declaratory judgment and permanent injunction, and affirmed the Municipal Court's judgments. Before the trial court reduced its oral ruling to writing, the defendants had already filed a series of motions in response. The defendants' motions included (1) a motion to stay the final judgment and permanent injunction pending appeal, (2) a motion to reconsider pursuant to rule 59.04, and (3) a motion for a declaratory judgment that "police visits to their property . . . without proper legal justification [were] unlawful and violative of [their] constitutional rights." Through these motions, the defendants alleged numerous procedural errors, including the circuit court's failure to conduct a de novo review, failure to provide the defendants adequate time to file an answer to the City's complaint, and a lack of notice prior to consolidating the City's case with the pending appeals from municipal court. The defendants also alleged that the circuit court had errantly issued, sua sponte, a permanent injunction, declaratory judgment, and final judgment.

Subsequently, the circuit court issued two orders relevant to this appeal: its final order reducing its October 7 oral rulings to writing and its order denying the defendants' post-trial motions. In construing the meaning of Ordinance 2016-16, the court repeated its earlier finding regarding ambiguity: "This Court has previously remarked that the Ordinance is not a model of clarity, and it is not." However, it also concluded that "the purpose of the Ordinance was to prevent just the short-term rentals Defendants currently let." The circuit court based this finding on the preamble's language regarding the ordinance's purpose and on a comparison to the language in a state statute. While the court indicated that it did not understand what is meant by the inclusion of "the phrase 'by person or group of persons for lodging'" in the ordinance, it nevertheless concluded the ordinance was not ambiguous. The circuit court understood the ordinance as being designed to not "prevent owner occupiers of dwellings for renting a portion of their homes to third parties as long as the period of time is greater than 30 days." Thus, the circuit court ruled for the City on its frontline argument; that is, the circuit court concluded that J&J's interpretation of the Ordinance was incorrect. The circuit court did not address the City's fallback position that J&J had still violated Ordinance 2016-16 even if J&J's interpretation of the Ordinance was correct.

Given its understanding of the Ordinance, the circuit court granted the City's request for a declaratory judgment "that the Zoning Ordinance of the City as amended by Ordinance 2016-16 is valid and enforceable; that any total occupation of a building by individuals for less than 30 days is prohibited; and that Defendants have repeatedly violated this Ordinance." In accordance therewith, the circuit court affirmed the municipal court's rulings that J&J violated Ordinance 2016-16. The circuit court also granted the City's request for a permanent injunction, restraining all three defendants from "[s]hort term renting (for less than thirty (30) days) at any property . . . within the corporate limits of the City . . ." and from "[a]dvertising any such properties directly or indirectly for terms of less than thirty (30) days . . . ." The circuit court denied the defendants' motion for summary judgment, motion to dismiss, motion to reconsider, and motion for a stay. Additionally, it ruled that J&J's post-trial motion for declaratory judgment was "improper" because it "raise[d] a new issue which was not raised by the defendants during this litigation; namely that the visits of the [City] Police Department to their property were unconstitutional." It further ordered that "any other pending Motions filed by Defendant(s) prior to [the trial date] are hereby denied."

The defendants appealed, purportedly raising fifteen issues, each of which related to one or more of the following: the circuit court's procedure, the grant of a permanent injunction to the City, the denial of the defendants' requests for a temporary injunction and for a declaratory judgment, the City's petition for criminal contempt, and the order finding J&J in violation of Ordinance 2016-16.

II.

At the crux of this appeal is the interpretation of Ordinance 2016-16. J&J contends that the plain meaning of the Ordinance necessitates a ruling in favor of the defendants. Alternatively, J&J contends that, if the Ordinance is ambiguous, Tennessee law mandates construction of the Ordinance in favor of the property owners, thereby still requiring a ruling in favor of the defendants. The City argues the Ordinance unambiguously draws a distinction between owner-occupied properties, in which short-term rentals are allowed, and those properties that are not owner-occupied, in which short-term rentals are not allowed. As in the trial court, the City argues the correctness of this interpretation is demonstrated both through the plain language of the Ordinance and through the Ordinance's purpose as reflected both in its preamble and as understood in relation to a textual variance between the Ordinance and the definition of "Short-term rental unit" as set forth in a state statute. J&J counters that consideration of the Ordinance's purpose is improper when interpreting Ordinances. As for our standard of review, in considering this issue, the interpretation of an ordinance is a question of law, which we review de novo with no presumption of correctness afforded to the trial court's decision. *Amos v. Metro. Gov't of Nashville and Davidson Cnty.*, 259 S.W.3d 705, 710 (Tenn. 2008).

Local ordinances in Tennessee are interpreted using the same interpretive rules applicable to the interpretation of state statutes in Tennessee. *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 802 (Tenn. 2000) ("The rules of statutory interpretation are used when interpreting an ordinance."); *Metro. Elec. Power Bd. v. Metro. Gov't of Nashville & Davidson Cnty.*, 309 S.W.3d 474, 477 (Tenn. Ct. App. 2008) ("The same rules of construction used to interpret statutes apply to the interpretation of the Metro Charter and ordinances."); *Hargrove v. Metro. Gov't of Nashville & Davidson Cnty.*, 154 S.W.3d 565, 567-68 (Tenn. Ct. App. 2004) (noting that, in interpreting local ordinances, "[t]he tools for this job consist of the same rules of construction used to interpret state statutes"); *Tennessee Manufactured Hous. Ass'n v. Metro. Gov't of Nashville*, 798 S.W.2d 254, 260 (Tenn. Ct. App. 1990) ("Courts should construe municipal ordinances, including zoning ordinances, using the same rules of construction applicable to statutes.").

The Tennessee Supreme Court has explained the undertaking of statutory interpretation as follows:

> This Court's role in statutory interpretation is "to determine what a statute means." Specifically, we must decide "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Original public meaning is discerned through consideration of the statutory text in light of "well-established canons of statutory construction."
>
> We give the words of a statute their "natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose."

In the absence of statutory definitions, we look to authoritative dictionaries published around the time of a statute's enactment.

We consider the whole text of a statute and interpret each word "so that no part will be inoperative, superfluous, void or insignificant." We also consider "[t]he overall statutory framework." "[S]tatutes 'in pari materia'—those relating to the same subject or having a common purpose—are to be construed together . . . ."

*State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022) (internal citations omitted).

Additionally, the constitutional grounding of property rights in Tennessee is not without consequence with regard to the interpretive principles that are to be used when considering local ordinances. The Tennessee Supreme Court has long recognized "the private possession of property as a 'sacred right.'" *Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 212 (Tenn. 2009) (quoting *Stratton Claimants v. Morris Claimants*, 15 S.W. 87, 90 (Tenn. 1891) (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 358 (5th ed., Little, Brown & Co. 1883))). The Tennessee Supreme Court has also indicated that "[a] property owner's right to own, use, and enjoy private property is a fundamental right." *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 474 (Tenn. 2012). Given the underlying constitutional respect for property rights, where an ordinance is ambiguous, Tennessee courts "will resolve ambiguities in favor of the property owner's right to the unrestricted use of his or her property." *Northshore Corridor Ass'n v. Knox Cnty.*, 633 S.W.3d 561, 578 (Tenn. Ct. App. 2021); *see also Venture Holdings, LLC v. Metro. Gov't of Nashville & Davidson Cnty. by & through Metro. Bd. of Zoning Appeals*, 585 S.W.3d 409, 418 (Tenn. Ct. App. 2019); *421 Corp. v. Metro. Gov't of Nashville & Davidson Cnty.*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000). However, a statute is not rendered ambiguous simply "because the parties proffer different interpretations of [it]." *Parveen v. ACG S. Ins. Agency, LLC*, 613 S.W.3d 113, 119 (Tenn. 2020) (quotation omitted). "A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute. In other words, both interpretations must be reasonable in order for an ambiguity to exist." *Id.*

In accordance with the principles laid out above, we turn first to considering the Ordinance's plain language. Simply stated, the plain language does not appear to support the City's position or the conclusion of the circuit court. As noted above, the Ordinance prohibits a "vacation rental" in a residential zone and defines a "vacation rental" as follows:

A dwelling unit or other structure rented and/or used exclusively by a person or group of persons for lodging for terms of less than 30 days. Rented means any form of monetary or non-monetary consideration. A Vacation Rental is also a Short Term Rental.

- 9 -

The City reads this language as follows:

> [T]he plain meaning of the expressed language in the City's Ordinance is simple, clear and unmistakable: to prohibit STRs in residential districts when residences are the residences are [sic] not owner occupied. In other words, STR's are prohibited when the residential dwelling is for short-term rentals and used "exclusively" by the short term renters – absent the owner. The Ordinance permits STRs when it occurs while the owner lives in the home.

Addressing this reading of the Ordinance, the City explains:

> The logic behind this is that there is someone on the property with a vital interest, accountability and investment in the property and in the neighborhood and neighbors. The purpose of the Ordinance as defined, is to prohibit the very conduct of the Defendants: operating STRs on properties in which they do not reside, with little to no care about the neighbors nor the quiet enjoyment of the neighborhood.

However, the language of the Ordinance nowhere refers to owner-occupied properties or to an owner living on the premises of a vacation rental. Such language simply is not present. Additionally, the City's purported plain language reading diverges from the circuit court's purported plain language reading of the Ordinance in ways that are not fully appreciated by the City's argument. The circuit court stated in its final order that "the City did not want to prevent owner occupiers of dwellings from renting a portion of their homes to third parties *as long as the period of time is greater than 30 days*." (emphasis added). In the circuit court's view, the plain language did not authorize rentals for less than 30 days in owner-occupied dwellings, only rentals for longer than 30 days in owner-occupied dwellings. The City, however, has indicated that in its view the plain meaning of the Ordinance allows for shorter-term usage so long as the owner-occupier is present. While the City and the circuit court view the central pivot of the Ordinance between permissible and impermissible uses as turning upon an unstated distinction between owner-occupied and non-owner-occupied properties, the plain language does not appear to dictate such a reading.

To the contrary, J&J's interpretation of the Ordinance appears to fit more closely with its plain language. J&J reads the Ordinance as preventing it from maintaining in a residential area "[a] dwelling unit or other structure rented . . . exclusively by a person or group of persons for lodging for terms of less than 30 days" and/or from maintaining in a residential area "[a] dwelling unit or other structure. . . used exclusively by a person or group of persons for lodging for terms of less than 30 days." A dwelling unit that is rented by a person for longer than 30 days is not "rented . . . exclusively by a person or group of persons for lodging for terms of less than 30 days." A dwelling unit that is rented to be

- 10 -

used by a person for longer than 30 days is not "used exclusively by a person or group of persons for lodging for terms of less than 30 days."

Nevertheless, both the City and the circuit court have relied upon the Ordinance's purpose in concluding that J&J's reading must be in error. They derive their understanding of the Ordinance's purpose from two sources: its preamble and a textual variance between the Ordinance and the definition of "Short-term rental unit" in Tennessee Code Annotated section 67-4-1501(5). J&J contends that consideration of purpose is entirely improper when interpreting ordinances.

J&J's argument goes too far in asserting that purpose is immaterial and improper for consideration by Tennessee courts when interpreting statutes or ordinances. When a court engages in statutory interpretation (as noted above, the same principles apply to the interpretation of ordinances), purpose plays an important role. In *Colley v. Colley*, the Tennessee Supreme Court stated the following regarding the role of purpose in statutory interpretation:

> To interpret the statute, we focus on its text. "The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." "We presume that every word in a statute has meaning and purpose and that each word's meaning should be given full effect . . . ." We examine "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." A "cardinal rule of statutory construction is to effectuate legislative intent," and the rules of construction are aids to that end. "Our construction must be reasonable in light of the statute's purposes and objectives."

*Colley v. Colley*, 715 S.W.3d 293, 306 (Tenn. 2025) (internal citations omitted). A preamble, for example, is an entirely appropriate place to look to gain an understanding of the purpose of a legislative enactment. *See, e.g.*, *City of Kingsport v. Jones*, 268 S.W.2d 576, 578 (Tenn. 1954) (citing *Memphis St. R. Co. v. Byrne*, 104 S.W. 460, 464 (Tenn. 1907) (the preamble of a statute, "while not a part of the statute and not controlling, may be looked to and considered in ascertaining the intention of the General Assembly")); *Moorcroft v. Stuart*, No. M2013-02295-COA-R3-CV, 2015 WL 413094, at *9 (Tenn. Ct. App. Jan. 30, 2015) ("It is well-settled that we may turn to a statute's preamble and policy statements for guidance when seeking to resolve an ambiguity.").

Nevertheless, the circuit court and the City's use of purpose in the present case exceeds how purpose is to be used when interpreting statutes or ordinances. Addressing an express statutory purpose provision, Judge Joan Larsen, writing for the Sixth Circuit, observed that "a purpose statement may be a useful guide to construing statutory language.

- 11 -

But what a purpose provision cannot do is 'limit or expand the scope of the operative clause.'" *Commonwealth v. Biden*, 57 F.4th 545, 551-52 (6th Cir. 2023) (internal citations omitted). Similarly, the Eleventh Circuit stated that "purpose provisions 'can suggest only which permissible meanings of the enactment should be preferred' when the text is otherwise ambiguous." *Georgia v. President of the United States*, 46 F.4th 1283, 1300 (11th Cir. 2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 219 (2012)). Ultimately, while a statutory purpose provision may help inform the interpretation of a statute, "[t]he purpose clause cannot override the operative language." Scalia & Garner, *supra*, at 220; *see also Sturgeon v. Frost*, 587 U.S. 28, 56-57 (2019) (noting that "statements of purpose . . . 'cannot override a statute's operative language'"). This understanding of the interconnection between a purpose provision and text in statutory interpretation as informing, not overriding, is in accord with the Tennessee Supreme Court's statutory interpretation directives. *See Colley*, 715 S.W.3d at 306.

Various scholars and jurists, the latter both in scholarly works and judicial opinions, have offered insight into the dangers of abandoning textual analysis in the pursuit of serving the overarching purpose of a statutory scheme. In addressing a textualist critique of purposivism, Professor John F. Manning observed that "[t]he design of the legislative process emphasizes the need for compromise, and compromises are often complex, awkward, and even incoherent—thus making it dangerous for judges to smooth over the details of an agreed-upon text to make it more coherent with its perceived purpose." John F. Manning, *Competing Presumptions About Statutory Coherence*, 74 Fordham L. Rev. 2009, 2010 (2006). Professor Manning has also noted that "[b]ecause statutory details may reflect only what competing groups could agree upon, legislation cannot be expected to pursue its purposes to their logical ends; accordingly, departing from a precise statutory text may do no more than disturb a carefully wrought legislative compromise." John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 18 (2001).

In a similar vein, Justice Amy Coney Barrett has observed that legislatures "draw lines" and that "[e]xtending a statute to better accomplish its purpose takes the statute further than a majority" of the legislature actually "chose to go." Amy Coney Barrett, *Listening to the Law: Reflections on the Court and Constitution* 217 (2025). Justice Barrett added that a legislature "does not just choose an end — it also chooses a specific means of accomplishing that end." *Id.* As the United States Supreme Court has stated,

> The "plain purpose" of legislation . . . is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the

> final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986) (internal citation omitted).

This is, in part, because "compromise is inherent in the legislative process, and compromise typically dilutes statutory purpose."[5] Overreading a general purpose provision defeats the compromise, and "a compromise must be able to use words to specify just how far that decision has gone" even where the compromise is not consistent with the broadly stated purpose of the statute.[6] As the United States Supreme Court has indicated, "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent . . . to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987); *see also*, *e.g.*, *Stanley v. City of Sanford, Fla.*, 145 S. Ct. 2058, 2067 (2025) ("But it is 'quite mistaken to assume . . . that any interpretation of a law that does more to advance a statute's putative goal must be the law.' . . . 'Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs.'"); *Erie Ins. Exch. by Stephenson v. Erie Indem. Co.*, 68 F.4th 815, 820 (3d Cir. 2023) ("But no legislation pursues its purposes at all costs," and "we are not free to rewrite this statute (or any other) as if it did").

One of the best explications of the overarching takeaway from these considerations was offered by Justice Antonin Scalia, who observed that when interpreting a statute, the members of the court "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n. 4 (1994). The same principle applies to Tennessee courts in considering the interrelationship between purpose and text. *Armitage v. Kasulis*, No. E2024-01906-COA-R3-CV, 2025 WL 3765875, at *9 (Tenn. Ct. App. Dec. 29, 2025); *Armitage v. Hale*, No. E2024-01905-COA-R3-CV, 2025 WL 3765874, at *9 (Tenn. Ct. App. Dec. 29, 2025). Accordingly, while a statutory purpose informs the interpretation of text, it may not trump the operative text of the statute. The same principle applies to ordinances.

---

[5] Jonathan R. Siegel, *The Inexorable Radicalization of Textualism*, 158 U. Pa. L. Rev. 117, 125-26 (2009).

[6] John F. Manning, *Competing Presumptions About Statutory Coherence*, 74 Fordham L. Rev. 2009, 2041 (2006).

In the present case, the City and the circuit court focus primarily on the Ordinance's preamble to derive its purpose. As noted above, the preamble provides as follows:

> WHEREAS, the City of Hendersonville is committed to providing all residents with safe and quiet residential neighborhoods and to maintaining the highest quality of life standard;

> WHEREAS, Hendersonville's growth and success have been built on housing standards and codes to favor the growth and development of residential neighborhoods; and

> WHEREAS, it has been determined by the Board of Mayor and Aldermen of the City of Hendersonville that it is necessary to impose restrictions on the use of homes as Vacation Rentals in order to protect the residential character of the residential zones in the City of Hendersonville.

Both the circuit court and the City understand this purpose provision as distinguishing owner-occupied properties from those where the owner is absent. However, as in the language of the Ordinance itself, nowhere in the language of the preamble is there any reference to owner-occupied properties. We are unclear as to how the preamble supports reading the Ordinance to indicate that the local legislative body drew a distinction between owner-occupied and non-owner-occupied properties. The preamble informs of the City's desire for safe and quiet neighborhoods and its favoring of growth and development of residential neighborhoods. The preamble indicates a necessity to impose "restrictions" upon using homes as "Vacation Rentals," which is a term, as has been discussed above, defined in the Ordinance. The purpose provision does not address, at all, the limitations upon how far these "restrictions" reach and does not provide any indication that owner-occupied status is a matter of significance in the Ordinance or in serving its purpose. Such a distinction between owner-occupied and non-owner-occupied properties is simply not present in the language of the preamble. These deficiencies are problematic for the City's position and for the circuit court's understanding of the purpose of the Ordinance.

The provision in dispute in the present case is the result of the compromise inherent in the legislative process. It is a compromise upon how far the Ordinance, which restricts property usage, goes in the pursuit of its overarching purposes. This preamble tells the reader nothing with regard to where or how the line has been drawn by the Ordinance. Using the preamble's language to indicate a distinction between owner-occupied and non-owner-occupied dwellings and structures with regard to short-term rentals is more of an act of legislative drafting than judicial interpretation. This is the very reason for caution in reading an overarching purpose too aggressively to displace plain limiting language. Accordingly, reading the Ordinance in terms of owner-occupied versus non-owner-

occupied dwellings or structures would reflect a policy judgment of the court, not of the City Council of Hendersonville.

In looking to the purpose of the Ordinance, the City and the circuit court also turn to the textual variance between the Ordinance and the definition of "Short-term rental unit" as set forth in Tennessee Code Annotated section 67-4-1501(5). The City explains its argument on this point as follows:

> The City's Ordinance (Ord. 2016-16) defines an STR as,
>
> > "[a] dwelling unit or other structure rented and/or used <u>exclusively</u> by a person or group of persons for lodging for terms of less than 30 days. Rented means any form of monetary or non-monetary consideration. A Vacation Rental is also a Short Term Rental." [(emphasis added in the City's brief)].
>
> By comparison, an STR defined under State law is as follows:
>
> > "short-term rental unit' means a residential dwelling that is rented <u>wholly or partially</u> for a fee for a period of less than thirty (30) continuous days and does not include a hotel as defined in § 68-14-302 or a bed and breakfast establishment or a bed and breakfast homestay as those terms are defined in § 68-14-502." (See, Tennessee Code Annotated, § 67-4-1501(8) (emphasis added [in the City's brief])).
>
> Rented "wholly or partially" clearly means whether the entire home or part of the home is rented for a term of less than 30 days under the State statute. This further means that the property is an STR regardless if the property owner occupies the home or not.
>
> The City's Ordinance is more permissive in its definition allowing STRs when the property owner is present. Thus, this is the clear reason the City used the term "exclusively" rather than "wholly or partially," so that the owner, having a vested interest in the property and in the neighborhood, accounts for both.

The circuit court also addressed this textual variance in seeking to understand the purpose of the Ordinance. It analyzed this point as follows:

> It is clear from the language of the Ordinance and the statements of counsel that the Tennessee Code definition served as a precursor to the language

found in the Ordinance passed. Specifically, the City did not want to prevent owner occupiers of dwellings [from] renting a portion of their homes to third parties as long as the period of time is greater than 30 days. For this reason the phrase "wholly" or "partially" was excised from the final Ordinance draft and replaced with the word "exclusively".

The circuit court goes on to acknowledge that "for some reason the Court has yet to conclude. . . the phrase 'by person or group of persons for lodging' was inserted into the Ordinance, creating much of the dispute that presents itself today." The circuit court, however, added that "[c]learly, the purpose of the Ordinance was to prevent just the short-term rentals Defendants currently let. Just as clearly, the intent of the City Council was [to] tie its Ordinance to the Tennessee Short Term Rental Act, which would prevent the types of rentals permitted by Defendants."

Considering the textual variance between the City's Ordinance and the state statute, it is not clear to us that the purpose of the Ordinance is to draw a distinction between owner-occupied and non-owner-occupied dwellings and structures. There are multiple complications with the City's and the circuit court's approach to assessing the textual variance between the Ordinance and the state statute. One of the problems is that both derive their understanding from reading the two provisions as if the only variance is the replacement of the phrase "wholly or partially" in the Tennessee Code with "exclusively" in the Ordinance. That is not, however, the only difference between the two laws. There are multiple variances between the two provisions, including the preposition that immediately follows the aforementioned exchanged adverbs. With regard to the prepositions, there is an exchange of "for" in the statute with "by" in the Ordinance. In other words, even putting aside the other textual variances between the two provisions, the language of the statute is "wholly or partially for" as opposed to the Ordinance's use of "exclusively by."

Turning to dictionaries, a variance in meaning becomes apparent. Defined in light of their employment as alternatives to each other, "[w]holly" is defined as "to the full or entire extent" while "partially" is defined as "to some extent: in some degree." *Wholly, Merriam-Webster* https://www.merriam-webster.com/dictionary/wholly (last visited Feb. 2, 2026); *Partially*, https://www.merriam-webster.com/dictionary/partially; *see also* Oxford English Dictionary https://www.oed.com (last visited Feb. 2, 2026) (defining "wholly," in a usage tracing from the present back to 1325, as "[c]ompletely, entirely; to the full extent or amount; altogether, totally, thoroughly," and defining "partially," in a usage tracing from the present back as far as 1475, as "[t]o some extent; incompletely, restrictedly; partly"). Alternatively, "exclusively" means "in an exclusive manner: in a way limited to a single person, group, category, method, etc." *Exclusively*, Merriam-Webster, *supra*; *see also Exclusively*, Oxford English Dictionary, *supra* (defining "exclusively," in usage tracing from the present back to 1650, as "[s]o as to exclude all except some particular object, subject, etc.; solely").

- 16 -

A subtle distinction in meaning between "wholly or partially" and "exclusively" becomes magnified by the preposition that follows the adverb. The word "for," as used in the context of the statute's phrase "wholly or partially for," is a preposition that is "used as a function word to indicate purpose." *For*, Merriam-Webster, *supra*; *see also* Oxford English Dictionary, *supra* (defining "for," as applicable in this context, in a usage tracing from the present to Old English as "[w]ith a view to; with the object or purpose of; as preparatory to").[7] Alternatively, the word "by," in the context of the Ordinance in connection with "exclusively," is a preposition indicating "through the agency . . . or instrumentality of." *By*, Merriam-Webster, *supra*. Similarly, the Oxford English Dictionary defines "by" as "[i]ndicating the agent after a passive verb," which is precisely the verb form of "rented" and "used" in this Ordinance.[8] *By*, Oxford English Dictionary, *supra*. In other words, the Tennessee Code provision is focused on the purpose of rental ("rented wholly or partially for") while the Ordinance is focused on the person of the renter or user ("rented . . . exclusively by" and/or "used exclusively by").

While the circuit court disclaimed any understanding of the purpose of the "by a person or group of persons for lodging" language, treating it as immaterial, we cannot disregard this language. The language is part of defining who cannot be the sole renters or users of the property under the Ordinance. The prohibition of the Ordinance is, thus, upon the dwelling unit or other structure being rented solely by and/or used solely by a person or group of persons who are renting and/or using the property for lodging for less than 30 days. We cannot agree with the City and the circuit court that the exchange of "wholly or partially for" with "exclusively by" necessarily conveys that the purpose of the variance is to draw distinctions between owner-occupied and non-owner-occupied properties. At a minimum, it certainly does not clearly do so.

The City, at best, only creates ambiguity as to the Ordinance's meaning – that is as far up the hill as the arguments of the City can push this Ordinance. Despite its persistent efforts in its briefing, the problem for the City is that this Sisyphean rock then simply rolls right back down the hill.[9] It does so because, as we noted at the outset, where an ordinance that restricts property usage is ambiguous, Tennessee courts "will resolve ambiguities in

---

[7] The critical sentence in the Ordinance itself actually utilizes the preposition "for" in this purpose sense ("rented and/or used exclusively by a person or group of persons for lodging") and also in a durational sense ("for lodging for terms of less than 30 days"). Oxford English Dictionary (defining "for" as "[m]arking actual duration" and "marked intended duration"); Merriam-Webster Dictionary (defining "for" as "used as a function word to indicate duration of time or extent of space").

[8] Recall, the Ordinance defines Vacation Rental as "[a] dwelling unit or other structure rented . . . exclusively by . . . " and/or "[a] dwelling unit or other structure . . . used exclusively by."

[9] Sisyphus, who had been the king of Corinth, "drew upon himself the relentless wrath of Zeus. In Hades, he was punished by having to try forever to roll a rock uphill which forever rolled back upon him." Edith Hamilton, *Mythology: Timeless Tales of Gods and Heroes* 330-31 (2017).

favor of the property owner's right to the unrestricted use of his or her property." *Northshore Corridor Ass'n*, 633 S.W.3d at 578; *Venture Holdings, LLC*, 585 S.W.3d at 418; *421 Corp.*, 36 S.W.3d at 475.

J&J presumes this means that it did not violate the Ordinance and that it accordingly prevails. J&J's sense of having ultimately prevailed in this litigation is premature. The City has raised challenges not only to the legal basis of J&J's defense but also to the factual basis of J&J's defense. That is, before the circuit court, the City countered J&J's assertion that each of its properties had long-term renters for a period of more than 30 days. The City also raised challenges in connection with the timing of when these purported rentals occurred. Given the trial court's resolution of this case on the basis of its construction of the Ordinance, the circuit court did not reach the question of whether J&J had actually intermixed short and long-term renters, meaning that its properties were not rented or used exclusively by short-term renters of less than 30 days. The circuit court also did not address the timing of when such rentals may have occurred. There remains significant factual uncertainty as to the actual rental and usage of these properties. There is also a lack of briefing as to the myriad of legal questions that could potentially arise depending upon what the actual facts are regarding the rental and usage of these properties. We decline to speculate on the legal consequences of a diverse array of the potential factual circumstances. Remand presents the parties with an opportunity to establish in what ways the properties were actually rented and used and when these rentals or uses occurred. It also affords the parties an opportunity to focus on the legal consequences of these facts in relation to assessing whether J&J violated the Ordinance, as interpreted in this opinion, at some point in the past and whether it continued to do so.

III.

Beyond J&J's argument regarding interpretation of the Ordinance, J&J's brief, insofar as it addresses other issues on appeal, suffers from significant deficiencies. This creates challenges for the City in being able to respond to J&J's additional arguments and for this court in being able to address these additional arguments. The brief has deficiencies as to citing relevant portions of the record and legal authority in support of the contentions that are raised and, more generally, deficiencies in developing its contentions as something more than mere conclusory assertions and skeletal arguments. J&J has also raised arguments that were not properly presented to the trial court. While J&J purportedly raises 13 additional issues in the remaining 8 substantive pages of its brief, from our review, there appears to be no argument whatsoever in relation to several of these issues. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). Accordingly, those issues as to which no argument is advanced are waived.

Of these 13 issues, there are six as to which at least some argument is made in J&J's brief. It is not clear however how, or if, all of these arguments correspond with J&J's statement of the issues. In addressing these 6 additional issues that are, at least to some extent argued, we list them in the manner in which J&J captions its arguments within the argument section of its brief: (1) The City Failed to Introduce Any Evidence in This De Novo Proceeding, (2) Failure to Rule on Defendants' Declaratory Judgment Regarding Police Visits and Improper Reversal of Injunctive Relief Denial, (3) Failure to Grant Defendants' Motion for Injunctive Relief, (4) Procedurally Deficient Permanent Injunction, (5) Final Judgment and Declaratory Relief Issued Sua Sponte, and (6) The Injunction Was Substantively Deficient.

As for J&J's arguments in relation to (1) The City Failed to Introduce Any Evidence in This De Novo Proceeding and (3) Failure to Grant Defendants' Motion for Injunctive Relief, J&J fails in addressing either issue to cite to any authority in support of its argument that the trial court erred. Its argumentation on these issues is skeletal at best. Again, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Id*. Accordingly, those issues are waived.

With regard to the four remaining issues,[10] while there are serious deficiencies in J&J's briefing that potentially subjects these issues to waiver, we instead simply pretermit discussion thereof. Any relief that would be afforded in connection with these issues is already subsumed within the scope of our decision in connection with interpretation of the Ordinance. That is, our decision, herein, results in vacating the award of the declaratory judgment to the City and the permanent injunction against J&J. Additionally, a conclusion that J&J was too late in seeking declaratory judgment after the trial court's issuance of its oral ruling is not preclusive of J&J seeking declaratory judgment on remand. From J&J's thin and confusing briefing in relation to these issues, we do not understand it as seeking any relief in connection with these issues that is not already granted by our decision with regard to the interpretation of the Ordinance. Thus, as noted above, we pretermit discussion of the four remaining issues.

IV.

For the aforementioned reasons, we vacate the judgment of the Circuit Court for Sumner County. Costs of this appeal are taxed to the City of Hendersonville. The case is

---

[10] These include (2) Failure to Rule on Defendants' Declaratory Judgment Regarding Police Visits and Improper Reversal of Injunctive Relief Denial, (4) Procedurally Deficient Permanent Injunction, (5) Final Judgment and Declaratory Relief Issued Sua Sponte, and (6) The Injunction Was Substantively Deficient.

- 19 -

remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE
